# IN THE SUPREME COURT OF TEXAS

═══════════

No. 15-0903
No. 15-0905

═══════════

IN RE STATE FARM LLOYDS, RELATOR

═══════════════════════════════════════════

ON PETITIONS FOR WRIT OF MANDAMUS FROM THE
COURT OF APPEALS FOR THE THIRTEENTH DISTRICT OF TEXAS

═══════════════════════════════════════════

~consolidated for oral argument~

**Argued March 9, 2017**

JUSTICE GUZMAN delivered the opinion of the Court.

Electronic discovery plays an increasingly significant role in litigation and, often, at significant expense. Given the prevalence of discoverable electronic data, discovery disputes involving electronically stored information (ESI) are a growing litigation concern. With few occasions to enter the fray,[1] we have an opportunity in these consolidated mandamus proceedings to provide further clarity regarding ESI discovery.

Though increasingly common, electronic discovery concerns manifest in variable shades and phases. In this dispute, the parties are at odds over the form in which ESI must be produced, presenting conflicting views regarding the proper interpretation and application of our discovery

---

[1] *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 321-22 (Tex. 2009) (orig. proceeding) (delineating parameters for assessing a request for direct access to electronically stored information); *cf. Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9 (Tex. 2014) (involving a spoliation instruction as a sanction for failing to preserve electronic information).

rules concerning such matters. The requesting party seeks ESI in native form while the responding party has offered to produce in searchable static form, which the responding party asserts is more convenient and accessible given its routine business practices. Agreeing with the requesting party, the trial court ordered production in native form, subject to a showing of infeasibility. The court of appeals denied mandamus relief.[2]

Under our discovery rules, neither party may dictate the form of electronic discovery.[3] The requesting party must specify the desired form of production,[4] but all discovery is subject to the proportionality overlay embedded in our discovery rules and inherent in the reasonableness standard to which our electronic-discovery rule is tethered.[5] The taproot of this discovery dispute is whether production in native format is reasonable given the circumstances of this case. Reasonableness and its bedfellow, proportionality, require a case-by-case balancing of jurisprudential considerations, which is informed by factors the discovery rules identify as limiting the scope of discovery[6] and geared toward the ultimate objective of "obtain[ing] a just, fair, equitable and impartial adjudication"

---

[2] No. 13-14-00651-CV, 2015 WL 6510647, ___ S.W.3d ___ (Tex. App.—Corpus Christi Oct. 28, 2015) (cause number 15-0905 in this Court); No. 13-14-00616-CV, 2015 WL 6520998, ___ S.W.3d ___ (Tex. App.—Corpus Christi Oct. 28, 2015) (cause number 15-0903 in this Court).

[3] TEX. R. CIV. P. 196.4 (providing a request and object method for the form of ESI production).

[4] Id.

[5] TEX. R. CIV. P. 192.4 (prescribing limitations on scope of discovery), 196.4 (governing discovery of electronic or magnetic data).

[6] See id.

2

for the litigants "with as great expedition and dispatch at the least expense . . . as may be practicable."[7]

Delay and expense strain not only the resources of the parties, but also the judicial system.[8] Consequently, the discovery rules imbue trial courts with the authority to limit discovery based on the needs and circumstances of the case, including electronic discovery. Thus, when a party asserts that unreasonable efforts are required to produce ESI in the requested form and a "reasonably usable" alternative form is readily available, the trial court must balance any burden or expense of producing in the requested form against the relative benefits of doing so, the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the requested format in resolving the issues.[9] Even without quantifying differences in time and expense, evidence that a "reasonably usable" alternative form is readily available gives rise to the need for balancing, and if these factors preponderate against production in the requested form, the trial court may order production as requested only if the requesting party shows a particularized need for data in that form and "the requesting party pay[s] the reasonable expenses of

---

[7] TEX. R. CIV. P. 1.

[8] TEX. R. CIV. P. 192 cmt. 7 ("Courts should limit discovery under this rule only to prevent unwarranted delay and expense . . . ."); HON. NATHAN L. HECHT & ROBERT H. PEMBERTON, A GUIDE TO THE 1999 TEXAS DISCOVERY RULES REVISIONS II.A (1998), http://www.adrr.com/law1/rules.htm (observing that an impetus for early discovery-reform efforts was the realization that "unrestricted discovery could be used to undermine the cause of justice if litigants with resources and motive to do so could drive up the cost of litigation, effectively pricing their opponents out of court and delaying disposition").

[9] TEX. R. CIV. P. 192.4(b); *see also, e.g.*, *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 237-40 (S.D. Cal. 2015) (acknowledging the form of ESI discovery may be limited in light of similar considerations—regardless of accessibility—and explaining that "'inaccessible' simply means that expenditure of resources required to access the contents is itself unreasonable"); *Zubulake v. UBS Warburg LLC*, 216 F.R.D. 280, 284-91 (S.D.N.Y. 2003) (articulating similar principles as bearing on cost-shifting under the federal e-discovery rules when electronic data is inaccessible).

any extraordinary steps required to retrieve and produce the information."[10] Unless ordered otherwise, however, "the responding party need only produce the data reasonably available in the ordinary course of business in reasonably usable form."[11]

Because neither the trial court nor the parties had the benefit of the guidance we seek to provide today, we deny the petitions for writ of mandamus without prejudice, affording the relator an opportunity to reurge its discovery objections to the trial court in light of this opinion.

## I. Factual and Procedural Background

In these mandamus proceedings, residential homeowners sued their insurer and others alleging underpayment of insured hail-damage claims. The lawsuits assert statutory, contractual, and extra-contractual claims against the same insurer, State Farm Lloyds, in separate proceedings. We consolidated the mandamus petitions for argument because they present the same legal issues and substantially similar procedural underpinnings.

At issue are trial-court orders adopting a proposed protocol for the exchange of electronic discovery. As requested by the homeowners, the trial court ordered all ESI to be produced in its native or near-native forms rather than in the alternative,"reasonably usable" format State Farm

---

[10] TEX. R. CIV. P. 196.4; *see also Bridgepoint Educ.*, 305 F.R.D. at 240 (so long as the proportionality factors weigh against production in the form requested, "the cost of even accessible ESI's production may be shifted to a party that has not shown its peculiar relevance to the claims and defenses at hand"). "Extraordinary steps" include those expenditures over and above what would be required to produce in a "reasonably usable form" that is more convenient, less burdensome, or less expensive. *See* TEX. R. CIV. P. 192.4(a), 196 cmt. 3.

[11] TEX. R. CIV. P. 196 cmt. 3.

proposed in a competing discovery protocol.[12]  The court-ordered protocol does not require State Farm to convert data stored in another form back to native form or to produce the same information in multiple forms.  But it does require State Farm to produce ESI in native form regardless of whether a more convenient, less expensive, and "reasonably usable" format is readily available.  If native form is "infeasible" to produce, however, a near-native form may be substituted if the parties agree on the substituted form.

Native format "retains the file structure associated with and defined by the original creating application."[13]  For example, the native format is XLS for Microsoft Excel spreadsheets and DOC for older versions of Microsoft Word documents.  The homeowners insist production in native form is vital for several reasons related to the visibility, utility, and searchability of metadata.  Metadata, "colloquially known as 'data about data,' encompasses the structural information of a file that contains data about it as opposed to describing its actual substantive content.  Often hidden and embedded within the original file, metadata does not normally appear on a printed page."[14]

---

[12] The order defines "native form" as "the form in which the information was customarily created, used and stored by the native application employed by the producing party in the ordinary course of business." "Near-native form" is defined as "a form in which the item can be imported into the native application without a material loss of content, structure or functionality as compared to the native form."

[13] *Bridgepoint Educ.*, 305 F.R.D. at 228.

[14] *Id.*; *see also Aguilar v. Immigration & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 354-55 (S.D.N.Y. 2008) (identifying three types of metadata, with only the third being generally "produced as a matter of course":  (1) substantive metadata, which includes "modifications to a document, such as prior edits or editorial comments, and [codes]"; (2) system metadata, which includes "data concerning the author, date and time of creation, and the date a document was modified"; and (3) embedded metadata, which "consists of text, numbers, content, data, or other information that is directly or indirectly inputted into a [n]ative [f]ile by a user and which is not typically visible to the user viewing the output display of a native file," including "spreadsheet formulas, hidden columns, externally or internally linked files (such as sound files), hyperlinks, references and fields, and database information" (internal quotation marks removed)).

State Farm has offered to produce ESI in searchable, but "static" form. PDF, TIFF, and JPEG files are common examples of static electronic formats. Static forms of ESI are created by converting native formats into static images, which removes metadata from the native files. Static form may be searchable—to a more limited extent than native form—using optical character recognition (OCR) software.[15]

To support ESI production in searchable static form, State Farm offered evidence that it processes more than 35,000 new claims each day and, in the ordinary course of business, information related to those claims is routinely converted into static format. When claims are being processed, claims-related information is necessarily created in native form. With regard to some types of claims-processing information, the native form is static, for example, handwritten notes and photographs. But to facilitate efficient business operations, State Farm employs a central repository—the Enterprise Claims System (ECS)—that is "the system of record" for claims handling at State Farm.[16] Claims-related information originally created in disparate systemic locales must be uploaded to the ECS, where it is converted and stored in secure, read-only formats for data integrity and access (e.g., PDF, TIFF, or JPEG). By consolidating information from different sources into the ECS, the claims-file information becomes readily accessible for processing claims on behalf of

---

[15] *See, e.g.*, *Bray & Gillespie Mgmt. LLC v. Lexington Ins. Co.*, 259 F.R.D. 568, 586 (M.D. Fla. 2009) ("Because of the significant limitations of OCR . . . the ability to search would only have been as good as the ability of the OCR software to translate what appeared in the TIFF images. OCR also would not identify metadata that did not appear in the TIFF images . . . .").

[16] A business analyst for State Farm Mutual Automobile Insurance Company described the ECS "as a proprietary central application used by State Farm in the ordinary course of business to manage all aspects of the [] claim handling process for all State Farm affiliates and subordinates, including but not limited to those claims of State Farm Lloyds."

policyholders and enables effective management of claims processes. Some ESI information exists solely in the ECS platform, but other information may also exist in native forms elsewhere within thousands of State Farm servers.

According to State Farm's discovery expert, static format is beneficial because the information can be searched, reviewed, and handled without inadvertent or intentional alteration by ECS users. With regard to litigation impacts, the expert reported that ESI in static format is easier to Bates number for discovery; allows efficient management of documents as exhibits at depositions, hearings, and trials; enables redaction, which is not possible with most native forms of ESI; and avoids intentional or unintentional alteration of the information, which may be difficult to detect or propagate further disputes about data integrity. According to a State Farm business analyst, "ECS is the most reasonably available source of claim file information in the ordinary course of business. It is the most convenient, least burdensome and least expensive means of producing the information plaintiff requested."

State Farm's expert averred that production in the native form of files "would require State Farm to engineer a new process that includes determining upstream sources of the data, validating the upstream sources, determining whether native files of the information still exist, and developing an extraction method for the native versions."[17] Without quantifying the time or expense involved, the expert opined that "[t]hese additional steps would be an extraordinary and burdensome

---

[17] Whether the process State Farm's expert identified would have only case-specific utility or broader application is not clear from the record.

undertaking for State Farm" and are unnecessary because State Farm's proffered production form is "reasonably usable."

State Farm's business analyst further elaborated on the burden of native-form production relative to the convenience and cost-effectiveness of producing the information as it is maintained in the ECS, explaining that:

> forced departure from [State Farm's] standard business process for production to find other versions of information now incorporated into the claim file in ECS in other repositories . . . would require extraordinary efforts on State Farm's part . . . . Included in these additional efforts would be identifying all such repositories, finding ways to identify and match each item of information in ECS to the same information in other formats in other repositories, and then finding ways to capture, review and produce the duplicative information.

The homeowners supported their proposed electronic discovery protocol with expert testimony that static images have less utility compared to native format, which would allow them to see formulas in Excel spreadsheets, search and sort the information by data fields, analyze the relationship of data, and see information in color that may not translate as accurately to stored or printed static images. Referring to static-form production as "the electronic equivalent of a print out," the homeowner's expert explained that useful metadata would not be viewable in static form, including tracked changes and commenting in Word documents; animations, other dynamic information, and speaker notes in static printouts of PowerPoint documents; and threading information in emails that would allow construction of a reasonable timeline related to State Farm's processing of the homeowners' claims. The expert also opined that production of ESI in static form is significantly more expensive for the requesting party, due to the fact that storage costs rise with the size of the file and conversion to static form drastically increases the size of ESI files. The

8

homeowners thus assert searchable static format is not a "reasonably usable form," as State Farm contends.

The homeowners' expert also refuted State Farm's claim of burden, testifying production would be as simple as handing over native ESI on a "thumb drive or on an external hard drive." Noting that ESI in native form has to be gathered to create static form in the first instance, the expert disclaimed the existence of any added burden on State Farm, stating: "Not only would [producing in native format not] require extraordinary steps, it would require fewer steps than those that they are employing right now. When you take the native data, you are dealing with it as it lies." Summarizing the homeowners' position, the expert explained, "[W]e're not imposing any additional duties, we're only asking that they not be allowed to dumb down, to downgrade the data for production."

State Farm sought mandamus relief from the court of appeals, arguing in both cases that Texas Rule of Civil Procedure 196.4 allows for production of ESI in reasonably usable forms and, considering the proportionality concerns delineated in discovery Rule 192.4, the trial court abused its discretion in requiring native production in lieu of the reasonably usable form State Farm offered.

The court of appeals denied mandamus relief in both cases, holding:

> [Rule 196.4] does not offer State Farm the unilateral option to produce ESI in a "reasonably usable" format. Rather, Rule 196.4 incorporates the same procedure applicable to other forms of discovery—that is, the responding party is required to produce the information in the form requested unless the party serves timely objections or assertions of privilege.[18]

---

[18] No. 13-14-00616-CV, 2015 WL 6520998, at *5 ___ S.W.3d ___, ___ (Tex. App.—Corpus Christi Oct. 28, 2015) (cause number 15-0903 in this Court) (citation omitted); *see also* No. 13-14-00651-CV, 2015 WL 6510647 at *1, ___ S.W.3d ___ (Tex. App.—Corpus Christi Oct. 28, 2015) (cause number 15-0905 in this Court) (adopting the court

9

The court rejected State Farm's proportionality concerns, deeming State Farm's evidence of undue burden conclusory and lacking estimates of the time, expense, and "extraordinary steps" required to retrieve and produce ESI in the requested form.[19] The court found a complete absence of "data with which to conclude that the burden or expense of the proposed discovery outweighs its likely benefit."

State Farm, supported by several amici, characterize the lower court rulings as granting requesting parties "essentially unlimited power" to dictate how the responding party must conduct electronic discovery under the Texas Rules of Civil Procedure.[20] We set the matter for oral argument and write to (1) clarify that neither the requesting nor the producing party has a unilateral right to specify the format of discovery under Rule 196.4 and (2) provide guidance regarding the application of Rule 192.4's proportionality factors in the electronic-discovery context.

---

of appeals' opinion in the earlier case).

[19] The court also noted that "the record indicates that State Farm already produces ESI in the requested forms to its counsel. Under such circumstances, the trial court may have inferred that the production of ESI in the requested formats to real parties would not be unduly burdensome." 2015 WL 6520998, at *5, ___ S.W.3d at ___. With respect, we do not believe this description of the record is entirely accurate. The record shows only that, like the homeowners' counsel, State Farm has technology allowing ESI in native format to be viewed without altering its contents or metadata.

[20] *See, e.g.*, Amicus Curiae Br. of Chamber of Commerce of the United States of America & Texas Association of Business at 10 ("Real Parties would have courts force companies, at the whim of requesting parties, to reinvent its standard processes and retroactively convert documents that they store in non-native formats 'in the ordinary course of business' into the less efficient (and former) native versions."); Amicus Curiae Br. of Civil Justice League at 5 ("Is it really the law of Texas that a Texas litigant can compel a litigation opponent to change its business operations (however 'antiquated' one may think they are) merely because the litigant says so?"); Amicus Curiae Br. of Lawyers for Civil Justice at 1 ("To require a party to produce [ESI] exclusively in the format requested, without giving any consideration to the internal retention and production practices of the producing party, would severely weaken proportionality as a consideration in Texas ESI cases, driving up the cost of litigation and incentivizing settlement based on nuisance cost rather than the merits of a matter.").

## II. Discussion

### A. Standard of Review

The scope of discovery is generally within the trial court's discretion, but the court "must make an effort to impose reasonable discovery limits."[21] A writ of mandamus will issue only if the trial court reaches a decision "so arbitrary and unreasonable as to amount to a clear and prejudicial error of law" and the relator has no adequate remedy by appeal.[22] In determining whether the trial court clearly abused its discretion, an appellate court may not substitute its judgment for the trial court's determination of factual or other matters committed to the trial court's discretion, even if the mandamus court would have decided the issue differently.[23] Mandamus relief is only appropriate in such cases when the relator establishes that the trial court could have reached only one conclusion and that a contrary finding is thus arbitrary and unreasonable.[24] But with regard to questions of law and mixed questions of law and fact, "'a trial court has no "discretion" in determining what the law is or applying the law to the facts,' even when the law is unsettled."[25]

---

[21] *In re CSX Corp.*, 124 S.W.3d 149, 152 (Tex. 2003) (orig. proceeding).

[22] *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex. 2004) (orig. proceeding); *Walker v. Packer*, 827 S.W.2d 833, 839 (Tex. 1992) (orig. proceeding) (punctuation and citation omitted).

[23] *Walker*, 827 S.W.2d at 839-40.

[24] *Id.*

[25] *In re Prudential Ins. Co. of Am.*, 148 S.W.3d at 135-36 (quoting *Walker*, 827 S.W.2d at 840) (alteration omitted).

## B. Form of Electronic Discovery

The rules of civil procedure generally extend the scope of discovery to "any matter that is not privileged and is relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party."[26] As a counterbalance rested in concerns about "unwarranted delay and expense,"[27] Rule 192.4 expressly constrains the scope of discovery as to otherwise discoverable matters:

> The discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that:
>
> (a) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or
>
> (b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.[28]

To put it succinctly, "the simple fact that requested information is discoverable . . . does not mean that discovery must be had."[29] So while metadata may generally be discoverable[30] if relevant[31] and

---

[26] TEX. R. CIV. P. 192.3(a).

[27] TEX. R. CIV. P. 192 cmt. 7 ("Courts should limit discovery under this rule only to prevent unwarranted delay and expense as stated more fully in the rule. A court abuses its discretion in unreasonably restricting a party's access to information through discovery.").

[28] TEX. R. CIV. P. 192.4.

[29] *Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 543 (4th Cir. 2004) (discussing former Federal Rules of Civil Procedure 26(a) and 26(c)).

[30] *See U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 245-46 (S.D. Cal. 2015) (holding metadata is discoverable when the requesting party shows "'a particularized need for the metadata,' not simply a generalized view as to its importance" (quoting *Ky. Speedway LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. 05-138-WOB, 2006 WL 5097354, at *8-9 (E.D. Ky. Dec. 18, 2006)); *Aguilar v. Immigration & Customs Enf't Div. of U.S. Dep't of*

unprivileged,[32] that does not mean production in a metadata-friendly format is necessarily required. Indeed, as a federal district court recently observed, "a weak presumption against the production of metadata has taken hold," which may be due to "metadata's status as 'the new black,' with parties increasingly seeking its production in every case, regardless of size or complexity."[33]

*Homeland Sec.*, 255 F.R.D. 350, 357 (S.D.N.Y. 2008) ("Courts generally have ordered the production of metadata when it is sought in the initial document request and the producing party has not yet produced the documents in any form. On the other hand, if metadata is not sought in the initial document request, and particularly if the producing party already has produced the documents in another form, courts tend to deny later requests, often concluding that the metadata is not relevant." (internal citations omitted)).

[31] *Williams v. Sprint/United Mgmt. Co.*, 230 F.R.D. 640, 652 (D. Kan. 2005) ("[E]merging standards of electronic discovery appear to articulate a general presumption against the production of metadata, but provide a clear caveat when the producing party is aware or should be reasonably aware that particular metadata is relevant to the dispute."); *Aguilar*, 255 F.R.D. at 354-55 ("Courts have commented that most system (and substantive) metadata lacks evidentiary value because it is not relevant. System metadata is relevant, however, if the authenticity of a document is questioned or if establishing 'who received what information and when' is important to the claims or defenses of a party"; likewise, "embedded metadata"—such as "spreadsheet formulas, hidden columns, externally or internally linked files (such as sound files), hyperlinks, reference and fields, and database information"—is "often crucial" to understanding electronic documents like complicated spreadsheets and, thus, is generally discoverable (citations and punctuation removed)).

[32] *See Williams*, 230 F.R.D. at 653 (permitting defendant to remove metadata directly corresponding to privileged redacted information).

[33] *Bridgepoint Educ.*, 305 F.R.D. at 246 (citing cases and secondary authority including *Wyeth v. Impax Lab., Inc.*, 248 F.R.D. 169, 170 (D. Del. 2006), and *Williams*, 230 F.R.D. at 651)); *see S2 Automation LLC v. Micron Tech., Inc.*, No. CIV 11-0884 JB/WDS, 2012 WL 3656454, at *28 (D.N.M. Aug. 9, 2012) ("[C]ase law shows wariness about metadata's value in litigation. Many courts have expressed reservations about the utility of metadata, explaining that it does not lead to admissible evidence and that it can waste parties' time and money.").

We note that the first edition of *The Sedona Principles*, written by a nonprofit legal policy research and education organization dedicated to resolving electronic document production issues, urged that a "modest legal presumption" against the production of metadata should exist because most "metadata has no evidentiary value," making the time and money spent reviewing it a waste of resources. Principle 12 cmt. 12a (2005). The second edition of *The Sedona Principles* revised this conclusion, however, and removed language regarding such a presumption. *See Aguilar*, 255 F.R.D. at 356 (discussing the evolution of *The Sedona Principles*). Instead, the second edition opines

> Absent party agreement or court order specifying the form or forms of production, production should be made in the form or forms in which the information is ordinarily maintained or in a reasonably usable form, taking into account the need to produce reasonably accessible metadata that will enable the receiving party to have the same ability to access, search, and display the information as the producing party where appropriate or necessary in light of the nature of the information and the needs of the case.

Whether production of metadata-accessible forms is required on demand engages the interplay between the discovery limits in Rule 192.4 and production of electronic discovery under Rule 196.4, which provides:

> To obtain discovery of data or information that exists in electronic or magnetic form, the requesting party must specifically request production of electronic or magnetic data and specify the form in which the requesting party wants it produced. The responding party must produce the electronic or magnetic data that is responsive to the request and is reasonably available to the responding party in its ordinary course of business. If the responding party cannot—through reasonable efforts—retrieve the data or information requested or produce it in the form requested, the responding party must state an objection complying with these rules. If the court orders the responding party to comply with the request, the court must also order that the requesting party pay the reasonable expenses of any extraordinary steps required to retrieve and produce the information.[34]

In *In re Weekley Homes*, we summarized the "proper procedure" under Rule 196.4, including the directive that the parties "make reasonable efforts to resolve the dispute without court intervention."[35] Meeting and conferring to resolve e-discovery disputes without court intervention is essential because discovery of electronic data involves case-specific considerations and each side possesses unique access to information concerning reasonable and viable production methods,

---

*The Sedona Principles 2d*, Principle 12 (2007).

A third edition of the *Sedona Principles* is currently in the works and, in its presently proposed form, demonstrates the importance of proportionality in the production of ESI: "The production of electronically stored information should be made in the form or forms in which it is ordinarily maintained or that is reasonably usable given the nature of the electronically stored information and the proportional needs of the case." *The Sedona Principles 3d*, Principle 12 (2017 Public Comment Version).

[34] TEX. R. CIV. P. 196.4.

[35] *See In re Weekley Homes, L.P.*, 295 S.W.3d 309, 322 (Tex. 2009) (orig. proceeding) (citing TEX. R. CIV. P. 191.2).

14

resources (technological or monetary, for instance), and needs.[36]  *In re Weekley Homes* did not

consider the precise issues presented here, however—namely, whether the form requested controls

and how proportionality factors into the analysis.

At its core, the homeowners' claim that native-form production is required presumes the

requesting party can unilaterally determine the form of production.  But Rule 196.4 cannot be

construed so narrowly given its focus on "reasonable" efforts and "reasonabl[e]" availability.[37]

Though the term "reasonable" cannot be comprehensively defined, it naturally invokes the

jurisprudential considerations articulated in Rule 192.4.

Thus, if the responding party objects that electronic data cannot be retrieved in the form

requested through "reasonable efforts" and asserts that the information is readily "obtainable from

some other source that is more convenient, less burdensome, or less expensive," the trial court is

obliged to consider whether production in the form requested should be denied in favor of a

"reasonably usable" alternative form.[38]  In line with Rule 192.4, the court must consider whether

differences in utility and usability of the form requested are significant enough—in the context of

the particular case—to override any enhanced burden, cost, or convenience.  If the burden or cost

is unreasonable compared to the countervailing factors, the trial court may order production in (1) the

form the responding party proffers, (2) another form that is proportionally appropriate, or (3) the

---

[36] *Cf.* FED. R. CIV. P. 26 committee's note to 2015 amendment ("The parties may begin discovery without a full appreciation of the factors that bear on proportionality.  A party requesting discovery, for example, may have little information about the burden or expense of responding.  A party requested to provide discovery may have little information about the importance of the discovery in resolving the issues as understood by the requesting party.").

[37] *See* TEX. R. CIV. P. 196.4.

[38] *See* TEX. R. CIV. P. 192.4, 196 cmt. 3.

form requested if (i) there is a particularized need for otherwise unreasonable production efforts[39] and (ii) the court orders the requesting party to "pay the reasonable expenses of any extraordinary steps required to retrieve and produce the information."[40]

Here, State Farm contends searchable static form is not only adequate, but more cost-effective and convenient. In other cases, a party may resist static-format production, if requested, because producing in native format is easier and less expensive. When a reasonably usable form is readily available in the ordinary course of business, the trial court must assess whether any enhanced burden or expense associated with a requested form is justified when weighed against the proportional needs of the case.[41] The proportionality inquiry requires case-by-case balancing[42] in light of the following factors:

1. <u>Likely benefit of the requested discovery</u>: If the benefits of the requested form are negligible, nonexistent, or merely speculative, *any* enhanced efforts or expense attending the requested form of production is undue and sufficient to deny the requested discovery. In such cases, quantifying or estimating time and expenses would not be critical, as it may be when benefits clearly

---

[39] The option to shift costs to the requesting party does not, in and of itself, sanctify an order for an unreasonable form of production, because the burdens of delay and expense are not borne only unto the parties, but also the judicial system. *Cf.* HECHT & PEMBERTON, *supra* note 8.

[40] TEX. R. CIV. P. 196.4.

[41] Self-imposed burdens and expenses related to forms generated for the purpose of litigation, rather than in the ordinary course of business, do not factor into the analysis.

[42] *Cf., e.g.*, *Capetillo v. Primecare Med., Inc.*, No. CV 14-2715, 2016 WL 3551625, at *2 (E.D. Pa. June 29, 2016) (proportionality determinations are to be made on a case-by-case basis using the factors listed in the federal discovery rules with no single factor being dispositive); *Bell v. Reading Hosp.*, No. CV 13-5927, 2016 WL 162991, at *2 (E.D. Pa. Jan. 14, 2016) ("[P]roportionality determinations are to be made on a case-by-case basis."); *Carlson v. Jerousek*, 68 N.E.3d 520, 533 (Ill. App. Ct. 2016) (observing that the proportionality requirement in the Illinois discovery rules "specifically targets the challenges posed by the discovery of ESI" and necessitates a case-by-case analysis).

exist. At the opposite end of the spectrum, a particularized need[43] for the proposed discovery will weigh heavily in favor of allowing discovery as requested but, depending on the force of other prudential concerns, may warrant cost-shifting for any "extraordinary steps" required.[44]

Courts should consider cumulative effects rather than viewing benefits and burdens in a vacuum. Here, for example, many similar cases arising from the same extreme weather event are currently pending against State Farm. The identification and retrieval process State Farm would have to develop for native-form production may be a ticket for one train only—exponentially increasing the burden when considered in the context of repeated litigation—or have broader utility, which could have a cumulatively reductive effect. The record does not tell us, but if there are likely uses for the identification and retrieval process beyond the instant mandamus cases, initial burden and expense may be substantially ameliorated, and if not, the burden and expense may be significantly enhanced.

2. The needs of the case: In these mandamus cases, the homeowners seek native production both for optimal search capability and to access metadata. Recognizing that metadata serves no genuinely useful purpose in many cases, "many parties, local rules and courts have [in current

---

[43] *See S2 Automation LLC v. Micron Tech., Inc.*, No. CIV 11-0884 JB/WDS, 2012 WL 3656454, at *27 (D.N.M. Aug. 9, 2012) (discussing Professor Moore's conclusion that if a "requesting party can demonstrate a particularized need for the native format of an electronic document, a court may order it produced" (quoting 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 34.12[3][c], at 34-48 to 34-49 (3d ed. 2012))).

[44] We observe, parenthetically, that the comments to rule 196.4 place the burden of specifying "any extraordinary steps for retrieval and translation" on the *requesting party*, *see* TEX. R. CIV. P. 196 cmt. 3, which may necessitate collaborating with the responding party before requesting production of electronic discovery in a particular format.

practice] endorsed the use of [static] image production formats, principally TIFF and [PDF] formats."[45] But metadata may be important, even dispositive in some cases.[46]

Relevance of metadata and the relative significance to the case must be determined on a case-by-case basis. But metadata's relevance must be obvious or at least linked, more or less concretely, to a claim or defense. Hypothetical needs, surmise, and suspicion should be afforded no weight. As a general proposition, metadata may be necessary to the litigation when the who, what, where, when, and why ESI was generated is an actual issue in the case, not merely a helpful or theoretical issue.[47] Take, for instance, a wrongful termination case where timing of the events

---

[45] *U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 244 (S.D. Cal. 2015) (quoting *The Sedona Principles 2d*, Principle 12 cmt. 12b (2007)); *see Wyeth v. Impax Labs., Inc.*, 248 F.R.D. 169, 171 (D. Del. 2006) ("Emerging standards of electronic discovery appear to articulate a general presumption against the production of metadata."); *Kty. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, No. CV 05-138-WOB, 2006 WL 5097354, at *7-8 (E.D. Ky. Dec. 18, 2006).

[46] *See Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-CV-00047-MSK-MEH, 2010 WL 3489922, at *4 (D. Colo. Aug. 31, 2010) ("access to metadata may demonstrate definitively the authorship, development, and drafting of the electronic documents at issue," a pivotal matter in light of the fraud allegations in the case (punctuation removed))*; Aguilar v. Immigration & Customs Enf't Div. of U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 354 (S.D.N.Y. 2008) (although system and substantive metadata generally lack evidentiary value, "[s]ystem metadata is relevant . . . if the authenticity of a document is questioned or if establishing who received what information and when is important to the claims or defenses of a party," and the type of ESI may make embedded metadata critical to understanding the document (internal quotation marks removed)); *MC Asset Recovery, LLC v. Castex Energy, Inc.*, No. 4:07-CV-076-Y, 2012 WL 12919263, at *8 (N.D. Tex. Apr. 26, 2012) ("Plaintiffs have made a strong showing of the usefulness and importance of metadata to its case . . . given that a central issue in this case is the question of when Defendants began negotiating with Apache for the purchase of Plaintiff's assets."); *Ryan v. Gifford*, No. CIV.A. 2213-CC, 2007 WL 4259557, at *1 (Del. Ch. Nov. 30, 2007) (ordering production of metadata after concluding that "metadata may be especially relevant . . . where the integrity of dates entered facially on documents authorizing the award of stock options is at the heart of the dispute . . . [and] plaintiffs have clearly shown a particularized need for the native format").

[47] *See Aguilar*, 255 F.R.D. at 354.

leading up to and following termination or authorship of case-critical documents might be a central issue in the case.[48]

Here, the homeowners have argued production in native format is necessary to ensure disclosure of all potentially relevant information. By way of example, the homeowners provided evidence that captions annotating some photographs of hail damage to a house—such as "north elevation with hail damage missed by [claims adjuster]"—were not captured when the photographs were converted to static format in the ECS. State Farm insists, however, that PDF production of photos from the ECS does not support the necessity for native-form production, as the homeowners claim, because the omitted photo captions were provided to the homeowners through an ECS "caption log" as well as via production from another database State Farm had identified as storing discoverable ESI.[49] In evaluating whether a particular form of production is required, the court should consider not only the relative importance of the information to the central issues in the case,

---

[48] *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 586 F. Supp. 2d 1250, 1264 (D. Kan. 2008) (authorizing discovery of metadata to allow plaintiff to confirm or contradict when the documents were authored because timing was a critical issue with regard to termination of plaintiff's employment); *cf.* Doug Austin, *Metadata Plays Key Role in $10.8 Million Whistleblower Lawsuit Verdict: eDiscovery Case Law*, JDSUPRA (Feb. 14, 2017) http://www.jdsupra.com/legalnews/metadata-plays-key-role-in-10-8-million-10412 (identifying metadata associated with the employee's most recent performance evaluation as a key piece of evidence at trial because it showed the review, which had been dated before his termination, was actually created a month after termination).

[49] In addition to the ECS, State Farm identified seven other data sources for discoverable information and delineated reasonably usable formats for production from these sources: Online Reinspection Tool (searchable PDF of worksheets and photographs and other materials in the form they exist in that system); Management Closed Assignment Review (Microsoft Excel format); Messaging Archive for email and instant messages (emails in MSG, EML, or PST and attachments in native format they are archived in, such as DOC, PPT, XLS, PDF, JPEG, etc.); Enterprise Complaint Tracking (Microsoft Excel format); Fire Master Record; Information from State Farm Human Resources data sources; and Enterprise Claim Survey Tool (searchable PDF format).

but also availability of that information from some other source that is more convenient, less burdensome, or less expensive.[50]

3. <u>The amount in controversy</u>: Accessibility—or relative inaccessibility—of electronic data contributes to increased costs and burdens associated with electronic discovery.[51] "While large companies are still learning to cope with e-discovery costs, e-discovery remains costly and complex for the small company, small case, and unrepresented litigant. Because e-discovery is very expensive and quite complicated, the advent of e-discovery is forcing settlements, and thus, denying litigants an opportunity to litigate the merits of the case."[52]

When the discovery rules were adopted, an explanatory guide explained an initial impetus for discovery constraints that rings just as true in today's electronic discovery frontier:

> For four decades following adoption of the federal rules, discovery procedures were continually expanded. In the 1970's, however, it became apparent that unrestricted discovery could be used to undermine the cause of justice if litigants with resources and motive to do so could drive up the cost of litigation, effectively pricing their opponents out of court and delaying disposition. Innovations in computer word processing, facsimile transmissions, and photocopying quickly made it possible for litigants of even modest means to drive up litigation costs and by "burying" their opponents in voluminous "boilerplate" discovery requests or objections, often with little more than the touch of a button. Technological changes have greatly increased the volume of documents and things that can be discoverable in a lawsuit. These developments in discovery practice have been compounded by an unfortunate

---

[50] In this case, the record suggests the captions referred to damage that was not caught on initial inspection, but was identified on reinspection and paid under the policy. According to a State Farm witness, the captions were produced to the homeowners from State Farm's Online Reinspection Tool.

[51] *See U.S. ex rel. Carter v. Bridgepoint Educ., Inc.*, 305 F.R.D. 225, 228 (S.D. Cal. 2015) ("Although it has no single definitive definition, the 'accessibility' of certain ESI is a function of its reproduction's expense in a particularly requested or desired format.").

[52] Jennifer M. Smith, *Electronic Discovery and the Constitution: Inaccessible Justice*, 6 J. LEGAL TECH. RISK MGMT. 122, 141-42 (2012).

weakening of professional norms that in earlier times would have made misuse or abuse of discovery unthinkable.[53]

For these reasons, the amount in controversy plays a pivotal role in determining whether production in a specified form is justified given the burden or expense required to meet the demand.

4. <u>The parties' resources</u>: Whether the producing party has the means to fairly and realistically produce in the requested format is a significant proportionality consideration. An expense that is a drop in the bucket to one party, may be insurmountable to another.[54] While this factor is important to the balancing inquiry "considerations of the parties' resources does not foreclose discovery requests addressed to an impecunious party, nor justify unlimited discovery requests addressed to a wealthy party."[55] Rather, "'the court must apply the standards in an even-handed manner that will prevent use of discovery to wage a war of attrition or as a device to coerce a party, whether financially weak or affluent.'"[56]

But beyond financial resources, one must also consider whether the requesting party has the technological resources to make proper use of ESI in the form requested.[57] A high-powered luxury

---

[53] HECHT & PEMBERTON, *supra* note 8; *cf.* FED. R. CIV. P. 26 committee's note to 2015 amendment ("What seemed an explosion in 1993 has been exacerbated by the advent of e-discovery.").

[54] *Davis v. E. Idaho Health Servs., Inc.*, No. 4:16-CV-00193-BLW, 2017 WL 1737723, at *4 (D. Idaho May 3, 2017) (considering "whether a company-wide search of employee personnel files is proportional to the needs of the case," and noting as one of the factors weighing in favor of the discovery order that the defendant "is a large company able to bear the costs of such discovery").

[55] FED. R. CIV. P. 26 committee's note to 2015 amendment.

[56] *Id.* (quoting advisory committee's note to 1983 amendment).

[57] *Cf. The Sedona Principles 3d*, Principle 8 cmt. 8b (2017 Public Comment Version) ("But as information technology has evolved, the concept of 'not reasonably accessible' must evolve. The cost and effort to attain what is asserted to be 'not reasonably accessible' will depend on a particular party's existing technologies and resources—not the best available in the market.").

sports car is useless to someone who lacks a license to drive it. To that point, the homeowners' discovery expert testified it would be more convenient for lawyers lacking advanced technology to use image formats, but the homeowners' counsel in this case has "invested considerably to have the tools necessary to be able to deal with advanced forms of information." This may be another way of looking at the benefit versus the burden; if the potential benefits could not be realized, any associated burden would be unwarranted.

5. Importance of the issues at stake in the litigation: Legal disputes are always important to those who are litigating them. For one side, however, the precedential value may be more significant than the other, justifying an outlay of time and expenses that would otherwise be unwarranted. Likewise, "'many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved.' Many other substantive areas also may involve litigation that seeks relatively small amounts of money, or no money at all, but that seeks to vindicate vitally important personal or public values."[58]

6. The importance of the proposed discovery in resolving the litigation: Discovery must bear at least a reasonable expectation of obtaining information that will aid the dispute's resolution. Reasonable discovery does not countenance a "fishing expedition."[59]

---

[58] FED. R. CIV. P. 26 committee's note to 2015 amendment (discussing proportionality considerations, including monetary stakes versus broader societal and policy impacts and quoting a 1983 Advisory Committee Note regarding proportionality).

[59] In re Alford Chevrolet-Geo, 997 S.W.2d 173, 181 (Tex. 1999) (orig. proceeding) ("[D]iscovery may not be used as a fishing expedition or to impose unreasonable discovery expenses on the opposing party."); see In re Ford Motor Co., 427 S.W.3d 396, 397 (Tex. 2014) (orig. proceeding) (characterizing discovery requests for sensitive information covering a twelve-year period as a "fishing expedition" that "is just the type of overbroad discovery the rules are intended to prevent"); see also Gilbert v. Highland Hosp., 31 N.Y.S.3d 397, 400 (N.Y. Sup. Ct. 2016) (concluding the plaintiff's request for metadata—an "audit trail" of the decedent's medical records—was not a "fishing expedition"

7. Any other articulable factor bearing on proportionality: The foregoing factors are derived directly from the discovery rules, but are certainly not exclusive. As history tells, technology is constantly evolving at rapidly increasing rates. The legal system is not nearly as agile, leaving us in a perpetually responsive posture. Trial courts have flexibility to consider any articulable factor that informs this jurisprudential inquiry.[60]

## C. Parity with the Federal Rules of Civil Procedure

Our application of proportionality principles in this context aligns electronic-discovery practice under the Texas Rules of Civil Procedure with electronic-discovery practice under the Federal Rules of Civil Procedure.

Rule 34 of the federal procedural rules, which governs electronic discovery in federal-court proceedings, states:

- A party may request "electronically stored information . . . stored in any medium from which information can be obtained either directly or, if necessary, after translation by the party into a reasonably usable form."[61]

- The request for ESI "may specify the form or forms in which electronically stored information is to be produced."[62]

---

because she requested "the decedent's audit trail, a document the plaintiff knows must exist because it is mandated by federal and New York law, for the specific reason of quantifying the level of involvement of the emergency department attending physician with the decedent's care while she was in the emergency department").

[60] *Cf.* FED. R. CIV. P. 26 committee's note to 2015 amendment ("The burden or expense of proposed discovery should be determined in a realistic way. Computer-based methods of searching such information continue to develop[, and] [c]ourts and parties should be willing to consider the opportunities for reducing the burden or expense of discovery as reliable means of searching electronically stored information become available.").

[61] FED. R. CIV. P. 34(a)(1)(A).

[62] FED. R. CIV. P. 34(b)(1)(C).

- "The responding party may state that it will produce copies of documents or of electronically stored information instead of permitting inspection."[63]

- "The response may state an objection to a requested form for producing electronically stored information. If the responding party objects to a requested form—or if no form was specified in the request—the party must state the form or forms it intends to use."[64]

- Absent agreement or court order:

  "If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms";[65] and

  "A party need not produce the same electronically stored information in more than one form."[66]

Rule 34's plain language does not permit either party to unilaterally dictate the form of production for ESI. The default form is "a form or forms in which [ESI] is ordinarily maintained or in a reasonably usable form or forms," and the trial court retains discretion to order discovery in a format that is appropriate to the circumstances.

The Advisory Committee Notes to Rule 34 explain:

If the requesting party is not satisfied with the form stated by the responding party, or if the responding party has objected to the form specified by the requesting party, the parties must meet and confer . . . in an effort to resolve the matter before the requesting party can file a motion to compel. If they cannot agree and the court resolves the dispute, *the court is not limited to the forms initially chosen by the*

---

[63] FED. R. CIV. P. 34(b)(2)(B).

[64] FED. R. CIV. P. 34(b)(2)(D).

[65] FED. R. CIV. P. 34(b)(2)(E)(ii).

[66] FED. R. CIV. P. 34(b)(2)(E)(iii).

24

*requesting party, stated by the responding party, or specified in this rule for situations in which there is no court order or party agreement.*[67]

The federal rules thus place the power to decide the form of electronic discovery not with the parties, but within the trial court's sound discretion.

In *Dizdar v. State Farm Lloyds*, a similar hail-storm lawsuit against State Farm involving a similar ESI protocol, a federal district court exercised its discretion to deny the plaintiff's request for native and near-native production.[68] The court explained that while the federal rules give "preference to documents produced as they are ordinarily maintained absent a specific request from the other party . . . it does not follow that if the requesting party specified a form for production, the information must be produced in that form."[69] The court determined that the plaintiffs could gain all the information necessary to litigate the claims against State Farm from the ECS claim file such that the existence of any additional burden was not justified. Finding State Farm's proffered form of production "a reasonably usable format" within the meaning of the federal discovery rules, the court granted State Farm's request to produce ESI in the searchable static image claims files archived in the ECS.[70]

---

[67] FED. R. CIV. P. 34 advisory committee's note to 2006 amendment (emphasis added).

[68] No. 7:14-CV-402, 2015 WL 12780640, at *10-11 (S.D. Tex. Jan. 21, 2015) (order).

[69] *Id.* at *3.

[70] *Id.* at *11.

To be sure, there are differences in language between the Texas rule and the federal rule. But as we affirmed in *In re Weekley Homes*, "our rules as written are not inconsistent with the federal rules or the case law interpreting them," even though they may not "mirror the federal language."[71]

In this regard, we observe the proportionality principles under the federal rules similarly limit discovery of otherwise discoverable information. Rule 26 delineates the scope of discovery as inherently limited by proportionality:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense *and* proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.[72]

The factors expressly identified as limitations on the scope of discovery accord with the proportionality analysis we have explicated under our discovery rules, keeping our procedures in line with their federal counterparts.[73]

Though the proportionality factors were recently relocated within the federal rules, proportionality has long been a required constraint on the scope of discovery, enacted decades ago "'to deal with the problem of overdiscovery.'"[74] Proportionality, it is said, acts as a governor "'to

---

[71] 295 S.W.3d 309, 316-17 (Tex. 2009) (orig. proceeding).

[72] FED. R. CIV. P. 26(b)(1) (emphasis added).

[73] *See Gilead Scis., Inc. v. Merck & Co.*, No. 5:13-cv-04057-BLF, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13, 2016) (Rule 26(b)(1) takes proportionality factors explicit or implicit in the federal discovery rules "to fix the scope of all discovery demands in the first instance.").

[74] FED. R. CIV. P. 26 advisory committee's note to 2015 amendment (quoting advisory committee's note to 1983 amendment).

guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.'"[75] The 2015 amendments to the federal rules have not altered "the existing responsibilities of the court and the parties to consider proportionality," do not require the requesting party to address all proportionality considerations, and do not permit the opposing party to rely on boilerplate objections of disproportionality.[76]  Rather, the amendment is directed to changing the existing "mindset" that relevance is enough,[77] restoring proportionality as the "collective responsibility" of the parties and the court.[78]

Discovery is necessarily a collaborative enterprise, and particularly so with regard to electronic discovery.[79]  The opposing party must object and support proportionality complaints with evidence if the parties cannot resolve a discovery dispute without court intervention,[80] but the party seeking discovery must comply with proportionality limits on discovery requests and "may well need

---

[75] *Id.* (quoting advisory committee's note to 1983 amendment).

[76] *Id.*

[77] *See Gilead Scis.*, 2016 WL 146574, at *1.

[78] FED. R. CIV. P. 26 committee's note to 2015 amendment; *see also Lopez v. U.S.*, No. 15-CV-180-JAH(WVG), 2017 WL 1062581, at *5 (S.D. Cal. Mar. 21, 2017) ("[B]oth parties share the responsibility of explaining their positions regarding the proportionality factors.").

[79] *See* FED. R. CIV. P. 26 committee's note to 2015 amendment ("The parties may begin discovery without a full appreciation of the factors that bear on proportionality.  A party requesting discovery, for example, may have little information about the burden or expense of responding.  A party requested to provide discovery may have little information about the importance of the discovery in resolving the issues as understood by the requesting party.").

[80] *Carr v. State Farm Mut. Auto. Ins.*, 312 F.R.D. 459, 467 (N.D. Tex. 2015) (noting that the federal rules do not allow a resisting party to "refuse discovery simply by making a boilerplate objection that [the requested discovery] is not proportional").

to . . . make its own showing of many or all of the proportionality factors."[81]  Recent federal cases

provide helpful examples of proportionality analyses in e-discovery cases.[82]  Consistent with an

individualized, case-specific inquiry, all manner of outcomes are represented—denials of requested

discovery on proportionality grounds,[83] rejection of proportionality complaints,[84] and cases taking

a more graduated approach by allowing limited bell-weather discovery to inform the propriety of

further discovery.[85]  Ultimately, the "court's responsibility, using all the information provided by the

parties, is to consider [the proportionality] factors in reaching a case-specific determination of the

---

[81] *Id.* at 468-69.

[82] *See* Gregory F. Brown, *Amended Rule 26's Proportionality Standard: The First 60 Days*, LAW360 (Feb. 12, 2016) (discussing post-2015 amendment cases).

[83] *See, e.g.*, *Scott v. Eglin Fed. Credit Union*, No. 3:16-CV-719-RV-GRJ2017, 2017 WL 1364600, at *3 (N.D. Fla. Apr. 13, 2017) ("requiring [the defendant] to search, collect and produce emails and text messages is not proportional to the needs of this case and therefore not within the scope of discovery as now defined in Rule 26"; "[b]alancing the marginal relevance of information in emails and text messages against the time and expense that would be involved for a small business like [the defendant] in searching cellular telephones, servers and other electronic storage facilities makes little sense and would cause Plaintiff's current employer to incur an expense that ultimately will have little or no impact on the outcome of the case"); *Crabtree v. Angie's List, Inc.*, No. 1:16-CV-0087-SEP-MJD, 2017 WL 413242, at *3 (S.D. Ind. Jan. 31, 2017) (denying defendant's request for a forensic examination of the plaintiffs' electronic devices because whatever evidence might be found was already available to the defendant from other sources and privacy and confidentiality interests were significant); *ACI Worldwide Corp. v. Mastercard Techs. LLC*, No. 8:14CV31, 2016 WL 6462249, at *2 (D. Neb. Oct. 27, 2016) (holding that while discovery of portions of MDS source code is appropriate, "ACI's request now for the entire source code to the MDS is not proportional to the needs of the case, would include information irrelevant to ACI's claims, and would defeat the purpose of the protracted efforts by the parties to reach a compromise regarding production of MDS source code").

[84] *See Bell v. Reading Hosp.*, No. CV-13-5927, 2016 WL 162991, at *3-4 (E.D. Pa. Jan. 14, 2016) (proportionality factors weighed in favor of discovery—the requested information was important to the issues at stake because other courts have considered that type of information in making the case-critical determination; the cost and burden of production did not outweigh the amount in controversy per plaintiff, plus attorney's fees, costs and liquidated damages; the defendant had more discoverable information and more resources than the plaintiff; though implicating seventeen different departments and thirty-five supervisors, the canvassing burden was relatively easy to meet considering the departments were all located in one place and quick and efficient information-gathering methods were available; and the benefit outweighed the burden because the requested discovery bore directly on the ultimate issue).

[85] *See, e.g.*, *Davis v. E. Idaho Health Servs., Inc.*, No. 4:16-CV-00193-BLW, 2017 WL 1737723, at *4-5 (D. Idaho May 3, 2017) (concluding relevant discovery seeking similarly situated employees was proportional, as limited in scope by the court).

28

appropriate scope of discovery."[86]  The same applies with regard to electronic-discovery practices under the Texas Rules of Civil Procedure.

### III. Conclusion

Today, we elucidate the guiding principles informing the exercise of discretion over electronic-discovery disputes, emphasizing that proportionality is the polestar.  In doing so, we further a guiding tenet of the Texas Rules of Civil Procedure:  that litigants achieve a "just, fair, equitable and impartial adjudication . . . with as great expedition and dispatch and at the least expense . . . as may be practicable."[87]  Because the trial court and the parties lacked the benefit of our views on the matter, neither granting nor denying mandamus relief on the merits is appropriate. Accordingly, we deny the request for mandamus relief without prejudice to allow the relator to seek reconsideration by the trial court in light of this opinion.[88]

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: May 26, 2017

---

[86] FED. R. CIV. P. 26 committee's note to 2015 amendment.

[87] TEX. R. CIV. P. 1.

[88] *See, e.g.*, *In re Smith Barney, Inc.*, 975 S.W.2d 593, 599 (Tex. 1998) (orig. proceeding) (concluding that when "denying mandamus relief[,] it is appropriate to state what the correct law is in order to permit the lower court to reconsider its decision"); *Crown Cent. Petroleum Corp. v. Garcia*, 904 S.W.2d 125, 128 (Tex. 1995) (orig. proceeding) (denying mandamus relief without prejudice to allow reconsideration in light of newly adopted guidelines for apex depositions); *Nat'l Tank Co. v. Brotherton*, 851 S.W.2d 193, 207 (Tex. 1993) (orig. proceeding) (denying mandamus relief to allow reconsideration in light of alterations to the controlling law); *Borders v. Hartman*, 814 S.W.2d 389, 389 (Tex. 1991) (orig. proceeding) (denying request for relief from the trial court's sanctions order without prejudice to allow the court to reconsider rulings in light of *TransAmerican* factors).