

# Fourth Court of Appeals
## San Antonio, Texas

## OPINION

No. 04-23-00779-CV

**IN RE TEXAS MEDICAL LIABILITY TRUST**

Original Mandamus Proceeding[1]

Opinion by:     Patricia O. Alvarez, Justice

Sitting:        Patricia O. Alvarez, Justice
                Luz Elena D. Chapa, Justice
                Liza A. Rodriguez, Justice

Delivered and Filed: March 20, 2024

PETITION FOR WRIT OF MANDAMUS CONDITIONALLY GRANTED

In the underlying dispute, Relator Texas Medical Liability Trust (TMLT) declined to defend its insured physician against claims brought by a former patient because it concluded the patient's claims alleged financial exploitation by the physician and his wife, not deficiencies in the physician's care for the patient. The physician sought a declaratory judgment that TMLT's policy covers the claims, and he sought to depose the former patient. TMLT opposed the deposition, but the trial court granted the physician's motion to compel the deposition, and TMLT seeks relief by mandamus. Having reviewed TMLT's petition, the physician's response, the former patient's response, and the mandamus record, we conditionally grant TMLT's petition.

---

[1] This proceeding arises out of Cause No. 2022CI11266, styled *David Friedman, M.D. v. Texas Medical Liability Trust*, pending in the 407th Judicial District Court, Bexar County, Texas, the Honorable Mary Lou Alvarez presiding.

BACKGROUND

To determine whether the trial court abused its discretion in granting the motion to compel the former patient's deposition, we must examine her petition and TMLT's policy. We begin by reciting some alleged facts from her live pleading.[2]

## A. Former Patient

Barbara C. Barnett was born in the fall of 1937. She has many close friends and loved ones; she is single, she has no siblings, and she has no children. She describes herself as an inexperienced and unsophisticated investor.

## B. Doctor-Patient Relationship

In the spring of 2012, Barnett first met David J. Friedman, M.D., when he began treating her for cancer. Dr. Friedman, an oncologist and hematologist, was working for Texas Oncology, P.A., and he treated Barnett for almost ten years. During that time, as her trust for him increased, she involved him in virtually all her medical care and treatment, and she referred to him as her personal physician.

## C. Personal Relationships

She and Dr. Friedman developed a close personal friendship, and she trusted him completely. Barnett shared with him her personal family history and information about her personal wealth. In the fall of 2015, Barnett invited Dr. Friedman and his wife Elizabeth to a college football game, which was when she first met Elizabeth. Subsequently, Elizabeth invited Barnett to lunch, to her home, and to social events. By early 2016, Elizabeth and Barnett had developed a close personal friendship. Barnett trusted Elizabeth; she shared personal information

---

[2] In our review of the trial court's order granting Dr. Friedman's motion to compel Barnett's deposition, we must "review[] the underlying pleadings [and we] must focus on the factual allegations that show the origin of the damages." *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997). Accordingly, we recite some of Barnett's alleged facts, but the merits of her claims are not before us.

with her, she invited Elizabeth and Dr. Friedman to stay in her lake house, and they began to share birthdays and other events together.

## D.       Financial Relationships

In 2015, Elizabeth formed Safen Medical Products, Inc., which was later converted into a limited liability company, Safen Medical Products, LLC (collectively SAFEN), with Elizabeth as the President, CEO, and Sole Manager.

Elizabeth told Barnett the company intended to develop, manufacture, and sell specialized medical tubing invented by Dr. Friedman.  During the time that Dr. Friedman was treating Barnett as her hematologist and personal physician, Elizabeth invited Barnett to purchase shares in SAFEN.  Based on her trust in Elizabeth and Dr. Friedman, and without the advice of counsel or a financial advisor, Barnett invested more than $3,000,000 in SAFEN.

## E.       Barnett Seeks Legal Help

In June 2020, Barnett retained legal counsel to help her prepare a will.  In reviewing Barnett's financial affairs, her counsel asked SAFEN for documentation about a September 15, 2020 check for $750,000 from Barnett to SAFEN.

SAFEN produced an instrument dated September 15, 2020, which Barnett describes as the Alleged Note; it purports to show that Barnett's September 15, 2020 check was the first of two advances due from Barnett to SAFEN under the Alleged Note.

Barnett denied executing the Alleged Note, and when Barnett's counsel asked SAFEN to repay the $750,000, SAFEN refused.

Instead, SAFEN demanded that Barnett pay SAFEN the second $750,000 advance it claimed was due under the Alleged Note.

**F.  Barnett's Suit**

In July 2021, Barnett sued SAFEN, Elizabeth, and Dr. Friedman.[3]  In her live pleading, Barnett alleges that Elizabeth and Dr. Friedman exploited their close personal relationship with her to get her to "purchase . . . millions of dollars in unregistered securities in Safen Medical Products, Inc. and Safen Medical Products, LLC, and [to make] significant loans to Safen Medical Products, LLC on terms which are commercially unreasonable."

Barnett's claims against Dr. Friedman (and Elizabeth) are for breach of fiduciary duties, statutory and common law fraud and fraudulent inducement, and breach of the Texas Securities Act.

Barnett also asserted claims against Elizabeth and SAFEN for breach of contract, to collect on a demand note for $750,000, and for a declaratory judgment that the funding requirement under the Alleged Note was unenforceable.

**G.  Doctor's Request for Coverage**

In September 2021, Dr. Friedman's counsel notified Texas Oncology of Barnett's suit.  The notice asserted that "[Barnett's] claims against Dr. Friedman, in his capacity as her physician, are unclear and uncertain."  The notice also asserted that Barnett's suit was "filed against [Dr. Friedman] in his capacity as a physician to [Barnett], [and the notice was] a request for defense and coverage under the policy" issued to Texas Oncology, P.A. by TMLT.

**H.  TMLT Denies Coverage**

TMLT denied coverage for Barnett's claims.  It explained that Barnett's claims were not for damages from injuries she sustained from Dr. Friedman treating her medical conditions.  It

---

[3] Cause No. 2021-CI-14733, styled *B.C. Barnett v. Safen Medical Products, LLC; Elizabeth Friedman, Individually and as Sole Manager of Safen Medical Products, LLC; and David J. Friedman, M.D.*, pending in the 224th Judicial District Court, Bexar County, Texas, the Honorable Marisa Flores presiding.

added that, even if her claims were covered, they were expressly excluded by the policy's exclusions.

## I.  Dr. Friedman Sues TMLT

Because TMLT denied coverage, in June 2022, Dr. Friedman sued TMLT.  His suit seeks a declaration that Barnett's claims against him are covered under TMLT's policy.

Dr. Friedman noticed his intent to depose Barnett, and Barnett and TMLT separately moved to quash Barnett's deposition.  Thereafter, Dr. Friedman moved to compel Barnett's deposition.

In its response to Dr. Friedman's motion, TMLT argued that the eight-corners rule applied, and Barnett's testimony would be outside the scope of permissible discovery.

## J.  Motion to Compel Deposition Hearing

In June 2023, the trial court held a hearing on Dr. Friedman's motion to compel Barnett's deposition.  Referencing a December 2022 hearing on the parties' competing motions for summary judgment on coverage, the trial court concluded that Barnett's claims were covered.

But TMLT noted, and the trial court acknowledged, that Dr. Friedman had not moved for summary judgment on the policy's exclusions.

Dr. Friedman then addressed discovery in Barnett's suit: "We kind of need to know what Ms. Barnett is claiming that Dr. Friedman did or did not do [and] having a trial right now without knowing what she was going to say would be difficult."  Dr. Friedman reasoned that "If we had [Barnett's] deposition . . . we would be able to find out what the basis of her allegations [sic], and we might be able to go to trial."

Returning to the case at bar, TMLT and Barnett argued that Barnett's claims were clear, she was not claiming medical malpractice by Dr. Friedman, and the eight-corners rule precluded Barnett's deposition.

The trial court explained that it wanted Barnett to clarify her pleadings: "I wanted her deposition in December because I'm curious, and still remain curious."

## K. Trial Court's Order

In large part, the trial court denied TMLT's and Barnett's motions to quash her deposition, and it granted Dr. Friedman's motion to compel her deposition. Its August 10, 2023 Order Regarding the Deposition of Barbara C. Barnett ordered Barnett's deposition to proceed but limited its scope to evidence on "[t]he allegations in [her] First Amended Petition . . . for purposes of determining . . . coverage of the allegations in the *Barnett* lawsuit by the [TMLT policy]; [TMLT's] duty, under the Policy, to defend [against Barnett's claims]; or any exclusions from coverage under the Policy."[4]

## L. TMLT's Petition

In its petition for writ of mandamus, TMLT argues that, in determining whether TMLT has a duty to defend Dr. Friedman against Barnett's claims, the eight-corners rule applies. The rule limits the trial court's review to the four corners of Barnett's pleading and the four corners of its insurance policy, and Barnett's alleged facts and the terms of its policy conclusively show that Barnett's claims are not covered. Further, no exceptions to the rule allowed the trial court to order Barnett's deposition apply, and the trial court abused its discretion by ordering her deposition.

Before we address TMLT's arguments, we briefly recite the applicable law regarding an insurer's duty to defend claims against its insured.

---

[4] Because of Barnett's age and health, the trial court also limited the time Barnett could be deposed, and it ordered breaks in the questioning to give her time to rest.

**EIGHT-CORNERS RULE**

## A.      Contractual Duty to Defend

"The duty to defend is a creature of contract arising from a liability insurer's agreement to defend its insured against claims or suits seeking damages covered by the policy." *Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 880–81 (Tex. 2020) (per curiam) citing *Richards v. State Farm Lloyds*, 597 S.W.3d 492, 498 (Tex. 2020).

"The goal in interpreting the contractual duty to defend—as when interpreting any contract language—is to 'ascertain the true intentions of the parties as expressed in the writing itself.'" *Richards*, 597 S.W.3d at 499 (quoting *Burlington Res. Oil & Gas Co. LP v. Tex. Crude Energy, LLC*, 573 S.W.3d 198, 202–03 (Tex. 2019)).

## B.      Initial Inquiry

"[T]he eight-corners rule [is] the initial inquiry to be used to determine whether a duty to defend exists, and it will resolve coverage determinations in most cases." *Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 201 (Tex. 2022) (citation omitted); *see Pharr-San Juan-Alamo Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self Ins. Fund*, 642 S.W.3d 466, 477 (Tex. 2022) (citing *Monroe*, 640 S.W.3d at 202) ("[O]ur 'initial inquiry' is whether the [plaintiff's] petition states a claim that could trigger the duty to defend under the eight-corners rule."); *accord Richards*, 597 S.W.3d at 494–95.

## C.      Two Documents, Eight Corners

"The eight-corners rule directs Texas courts to determine a liability insurer's duty to defend its insured based on (1) the pleadings against the insured and (2) the terms of the insurance policy." *Avalos*, 610 S.W.3d at 879; *accord Pine Oak Builders, Inc. v. Great Am. Lloyds Ins. Co.*, 279 S.W.3d 650, 654 (Tex. 2009).  "The rule takes its name from the fact that only two documents are ordinarily relevant to the determination of the duty to defend: the policy and the pleadings of the

third-party claimant." *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church*, 197 S.W.3d 305, 308 (Tex. 2006); *accord Monroe*, 640 S.W.3d at 199.

**D.     Assessing Allegations**

In applying the rule, we do not consider "'what the facts are or what might finally be determined to be the facts,' but 'only . . . what the facts are alleged to be.'" *Pharr-San Juan-Alamo Indep. Sch. Dist.*, 642 S.W.3d at 471 (quoting *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 25 (Tex. 1965)).

"[W]e give the allegations in the petition a liberal interpretation." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Merchs. Fast Motor Lines, Inc.*, 939 S.W.2d 139, 141 (Tex. 1997) (per curiam); *accord Richards*, 597 S.W.3d at 495. But "[we] look to the factual allegations showing the origin of the damages claimed, not to the legal theories or conclusions alleged." *Ewing Const. Co., Inc. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014); *accord ATOFINA Petrochems., Inc. v. Cont'l Cas. Co.*, 185 S.W.3d 440, 445 (Tex. 2005) (per curiam) (directing courts to "focus on the factual allegations that show the origin of the damages" (quoting *Nat'l Union Fire Ins.*, 939 S.W.2d at 141)).

We may not "'read facts into the pleadings' or 'imagine factual scenarios which might trigger coverage.'" *Monroe*, 640 S.W.3d at 202 (quoting *Nat'l Union Fire Ins.*, 939 S.W.2d at 142); *accord Pine Oak*, 279 S.W.3d at 655.

"If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured." *Pine Oak*, 279 S.W.3d at 654 (quoting *Nat'l Union Fire Ins.*, 939 S.W.2d at 141).

## EXCEPTIONS TO THE RULE

In applying the eight-corners rule, "[e]xtrinsic evidence or facts outside the pleadings are generally not considered." *Monroe*, 640 S.W.3d at 199 (citing *GuideOne*, 197 S.W.3d at 308).

But there are some exceptions. *Id.*

"[C]ourts may consider extrinsic evidence regarding whether the insured and a third party suing the insured colluded to make false representations of fact in that suit for the purpose of securing a defense and coverage where they would not otherwise exist." *Avalos*, 610 S.W.3d at 879; *accord Monroe*, 640 S.W.3d at 199 (reiterating *Avalos*'s exception).

Courts may also consider extrinsic evidence "if the underlying petition states a claim that could trigger the duty to defend [but there is] a gap in the plaintiff's pleading [which prevents the trial court from conclusively] determin[ing] whether coverage exists" and the extrinsic evidence meets three other requirements. *Monroe*, 640 S.W.3d at 201–02.

With the rule and the exceptions in mind, we turn to the question of whether the trial court could have properly ordered Barnett's deposition to determine whether her claims were covered or excluded under TMLT's policy.

### DUTY TO DEFEND ANALYSIS

We begin by reviewing the four corners of Barnett's petition and the four corners of TMLT's policy. *See Monroe*, 640 S.W.3d at 201 (initial inquiry); *Avalos*, 610 S.W.3d at 881 (pleading's, policy's corners).

Within the policy's four corners, the duty to defend is created by the policy's defense and coverage provisions, which in turn rely on the policy's definitions. *See Richards*, 597 S.W.3d at 499 (recognizing that the duty to defend arises from the policy's language). The policy includes the following definitions.

### A.  Policy Definitions

> A.   "*claim*" . . . means . . . [a] written demand from a *patient* [that] seeks compensatory *damages* because of *injury* resulting from an *insured incident* . . . .

B. "*damage*" means all compensatory *damages*, including prejudgment interest, which are payable because of *injury* or *injuries* to which *this policy* applies.

. . . .

H. "*injury*" means, as applicable, bodily *injury*, sickness or disease, death, libel, slander, defamation of character or invasion of rights of privacy.

I. "*insured*" means the *Named Insured*, an individual or entity shown in the Schedule of Insureds, or [certain others].

. . . .

J. "*insured incident*" means any and all *injuries* and compensatory *damages* arising out of . . . the *same, connected or related patient services*, including laser hair removal services, rendered by the *insured* . . . .

. . . .

N. "*patient*" means an individual under the care or treatment of the *insured* . . . .

. . . .

U. "*same, connected or related patient services*" means all professional services rendered to a *patient* for the same, connected, or related medical conditions (including all complications arising therefrom), although the professional services may be rendered over an extended period of time and may include multiple services, and includes, but is not limited to: (1) all obstetrical services rendered during pregnancy, labor, delivery and resuscitation of an infant or infants; and (2) organ transplantation procedures and professional services rendered to the donor and recipient *patients*.

V. "*this policy*" means this contract of professional liability insurance together with the Declarations Page and *endorsements*.

## B. Policy's Defense, Coverage Provisions

The policy's Defense and Appeal provision states when the duty to defend arises: "The Trust shall have the . . . duty to defend any *claim* . . . seeking compensatory *damages* against the *insured* which are payable under the terms of *this policy* . . . ." *See id.*

The policy's Professional Liability Coverage addresses the claims which are payable:

The Trust will pay on behalf of any *insured* under *this policy* all sums within the applicable limits of liability which such *insured* shall become legally obligated to pay with respect to a *claim* that . . . is for compensatory *damages* because of *injury* arising out of professional services rendered . . . by . . . [a]ny *insured* in the conduct of a medical practice.

**C.     Construing the Policy**

In our four-corners review of the policy, we read the definitions, defense provisions, and coverage provisions together. *See Richards*, 597 S.W.3d at 499 (noting that in reviewing an insurance policy, "[w]e consider the entire agreement and, to the extent possible, resolve any conflicts by harmonizing the agreement's provisions").

Under the policy's terms, TMLT has a duty to defend its insured against any claim for damages if the claim is payable under the terms of the policy.

To be payable under the policy, a claim must be for compensatory damages for an injury that arose from an insured incident.

An insured incident includes all the injuries and compensatory damages arising out of the same, connected, or related patient services rendered by the insured, which in turn means all professional services rendered by the insured to the patient for the patient's same, connected, or related medical conditions.

Professional services include services such as "(1) all obstetrical services rendered during pregnancy, labor, delivery and resuscitation of an infant or infants; and (2) organ transplantation procedures and professional services."

Incorporating the definitions into the provisions, we conclude the policy's duty to defend is triggered by a patient's covered claim for compensatory damages for injury that arose out of the professional services the insured rendered to the patient in the conduct of a medical practice. *See id.*

**D.     Construing the Petition**

*1.     Barnett's Alleged Facts*

In our four-corners review of Barnett's petition, we focus on the facts she alleges. *See Ewing Const.*, 420 S.W.3d at 33; *ATOFINA Petrochemicals*, 185 S.W.3d at 445.

In the first three pages of the petition's factual background, Barnett describes how she met and came to know and trust Dr. Friedman. She explains how Dr. Friedman began as her treating physician, then as their friendship and her trust in him grew, she considered him her personal physician, and she shared personal and financial information with him and Elizabeth.

In the next sixteen pages, Barnet alleges facts to show how Elizabeth and Dr. Friedman exploited their close personal relationship with Barnett to get her to "purchase . . . millions of dollars in unregistered securities in [SAFEN] and [to make] significant loans to [SAFEN] on terms which are commercially unreasonable." She alleges that Dr. Friedman and Elizabeth solicited her investments "while [Dr. Friedman] was treating Barnett professionally as her hematologist and personal physician, and while [Dr. Friedman, Elizabeth, and Barnett] carried on a close personal social relationship." She also alleges that, after she fell and broke her leg, Dr. Friedman "participated in [her] treatment at the hospital and prescribed her pain medication."

But Barnett's petition does not allege any facts that Dr. Friedman's medical care for her medical conditions caused her any injury or damage—either physical or financial. Thus, Barnett's alleged facts cannot support a claim that her financial injuries arose from Dr. Friedman's medical care for her. *See Ewing Const.*, 420 S.W.3d at 33; *ATOFINA Petrochemicals*, 185 S.W.3d at 445.

2.       *Barnett's Claims*

Barnett's petition presents six causes of action, but only three include Dr. Friedman as a defendant: breach of fiduciary duties, statutory and common law fraud and fraudulent inducement, and breach of the Texas Securities Act.

#### a. Breach of Fiduciary Duties

In her breach of fiduciary duties claim, Barnett alleges that she was a vulnerable adult,[5] she had a "longstanding friendship and relationship of mutual trust and confidence" with Elizabeth and Dr. Friedman, and as a result, they each owed her a fiduciary duty. She alleges Dr. Friedman and Elizabeth breached their fiduciary duties to her by inducing her to participate in high-risk investments, and she seeks damages for her financial losses.

#### b. Fraud, Fraudulent Inducement

In her fraud and fraudulent inducement claim, Barnett alleges that Dr. Friedman and Elizabeth "pursued and solicited [her] to purchase securities in SMP, Inc. and SAFEN [and they] falsely represented . . . that purchasing unregistered securities in SMP, Inc. and SAFEN was an appropriate investment for [her] and that she would make significant returns on her investment." She also alleges that Dr. Friedman and Elizabeth falsely represented SAFEN's assets, she relied on their false representations, and she suffered damages.

#### c. Breach of the Texas Securities Act

In her breach of the Texas Securities Act claim, Barnett alleges, inter alia, that "Elizabeth and [Dr. Friedman] misrepresented and omitted material facts with respect to [her] investment, SAFEN's 'assets' and business plan and operations." She states that she "hereby exercises her rights and seeks to recover pursuant to all remedies set forth in the Act." *See* TEX. GOV'T CODE ANN. § 4008.052 ("Offeror or Seller Liability: Untruth or Omission); *Slack v. Shreve*, No. 12-22-00024-CV, 2023 WL 2417971, at *1 n.1 (Tex. App.—Tyler Mar. 8, 2023, no pet.) (mem. op.) ("In 2019, the Legislature repealed The Texas Securities Act . . . and recodified it as Title 12 of the Texas Government Code.").

---

[5] *See* TEX. FIN. CODE ANN. § 281.001 (defining "vulnerable adult").

**E.      Applying the Eight-Corners Rule**

In applying the rule, we "look to the facts alleged within the four corners of the pleadings [and] measure them against the language within the four corners of the insurance policy." *Ewing Const.*, 420 S.W.3d at 33; *see Richards*, 597 S.W.3d at 494–95.

It is undisputed that TMLT's professional liability insurance policy was in effect when Barnett sued Dr. Friedman, Dr. Friedman gave TMLT the required notice of Barnett's suit, and Dr. Friedman was an insured under the policy.

A disputed point is whether Barnett's alleged facts bring her claims within the scope of the policy's coverage. *See Pine Oak*, 279 S.W.3d at 654 ("If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against its insured.").

We interpret Barnett's allegations liberally, *see Nat'l Union Fire Ins.*, 939 S.W.2d at 141, but we consider only the facts that are alleged in her petition, not those that might have been alleged or may eventually be proven, *see Pharr-San Juan-Alamo Indep. Sch. Dist.*, 642 S.W.3d at 471; *Pine Oak*, 279 S.W.3d at 655.

In Barnett's petition, none of her alleged facts point to any deficiency in the medical services Dr. Friedman provided to Barnett as the origin of her damages. *See Ewing Const.*, 420 S.W.3d at 33; *Nat'l Union Fire Ins.*, 939 S.W.2d at 141.

Instead, Barnett's alleged facts point to Dr. Friedman's alleged financial exploitation of her as the origin of her damages. *See Ewing Const.*, 420 S.W.3d at 33; *ATOFINA Petrochemicals*, 185 S.W.3d at 445 (recognizing that "court[s] must focus on the factual allegations that show the origin of the damages" (quoting *Nat'l Union Fire Ins.*, 939 S.W.2d at 141)).

We conclude that Barnett's petition does not allege any facts that place her claims within the scope of the policy's coverage. *See Nat'l Union Fire Ins.*, 939 S.W.2d at 141; *see also Pine Oak*, 279 S.W.3d at 654.

**F.      Exceptions to Consider Extrinsic Evidence**

Although we conclude that Barnett's claims are not within the policy's scope, we must also consider whether the *Avalos* or *Monroe* exceptions to the eight-corners rule would allow the trial court to grant Dr. Friedman's motion to compel Barnett's deposition.  *See Monroe Guar. Ins. Co. v. BITCO Gen. Ins. Corp.*, 640 S.W.3d 195, 201–02 (Tex. 2022); *Loya Ins. Co. v. Avalos*, 610 S.W.3d 878, 879 (Tex. 2020).

*1.      Avalos*

In *Avalos*, the court adopted an exception to address collusive fraud.  The exception allows courts to consider extrinsic evidence of collusion between the insured and the third-party plaintiff to make false representations that would bring the plaintiff's claims within the scope of the insured's coverage.  *Avalos*, 610 S.W.3d at 879.

Here, there is no evidence—or even allegation—that Barnett colluded with Dr. Friedman to make false statements to create coverage.  *Contra id.*

The *Avalos* exception to consider extrinsic evidence does not apply.  *See id.*

*2.      Monroe*

In *Monroe*, the court recognized another exception to consider extrinsic evidence in cases where *Avalos* does not apply.  *Monroe*, 640 S.W.3d at 201–02.  *Monroe* presented a multi-part test pertaining to a gap in the plaintiff's pleading.  *Id.*  But it restated the threshold inquiry another way: "[D]oes the pleading contain the facts necessary to resolve the question of whether the claim is covered?"  *Id.* at 202.

To be covered under the policy, Barnett's claim must be "a *claim* that . . . is for compensatory *damages* because of *injury* arising out of professional services rendered . . . by . . . [a]ny *insured* in the conduct of a medical practice."

Barnett's petition alleges that Dr. Friedman was her treating physician, she considered him her personal physician, she trusted him implicitly, and he used that trust to exploit her financially. But those alleged facts do not support, and she does not allege any others that would support, a claim for compensatory damages based on an injury arising out of the medical services Dr. Friedman rendered to her in the conduct of his medical practice.

For example, she does not allege any injury arising out of any defective professional services in Dr. Friedman's treatment of her medical conditions. Instead, she alleges facts to show that Dr. Friedman financially exploited her.

We conclude that Barnett's petition does not allege any facts that could bring any of her claims within the scope of the policy's coverage, and the *Monroe* exception does not apply. *See id.* at 201–02.

**G.     No Duty to Defend**

Having reviewed Barnett's petition and TMLT's policy under the eight-corners rule, we conclude that TMLT has no duty to defend Dr. Friedman against Barnett's claims because her petition does not allege any facts that could bring any of her claims within the policy's coverage for a claim for compensatory damages because of injury arising out of Dr. Friedman's professional services rendered to Barnett in the conduct of his medical practice. *See Pharr-San Juan-Alamo Indep. Sch. Dist.*, 642 S.W.3d at 478–79; *Monroe*, 640 S.W.3d at 202.

We have also concluded that neither the *Avalos* nor the *Monroe* exceptions apply. *See Monroe*, 640 S.W.3d at 201–02; *Avalos*, 610 S.W.3d at 879.

Therefore, the trial court's review of TMLT's duty to defend was limited to the four corners of TMLT's policy and the four corners of Barnett's petition; it could not properly consider extrinsic evidence. *See Monroe*, 640 S.W.3d at 201; *Pine Oak*, 279 S.W.3d at 654.

**H.      No Basis to Depose Barnett**

The extrinsic evidence at issue here is Barnett's deposition testimony, which Dr. Friedman moved to compel.

When considering the motion, the trial court stated its curiosity to hear what Barnett had to say, but the trial court's curiosity is not a recognized exception to the eight-corners rule.  *See Monroe*, 640 S.W.3d at 201–02; *Avalos*, 610 S.W.3d at 879.

Further, the trial court was not free to "'read facts into the pleadings' or 'imagine factual scenarios which might trigger coverage'" as grounds to order Barnett's deposition.  *See Monroe*, 640 S.W.3d at 202 (quoting *Nat'l Union Fire Ins.*, 939 S.W.2d at 142).

By granting Dr. Friedman's motion to compel Barnett's deposition when the eight-corners rule applied and there were no applicable exceptions to allow Barnett's deposition, the trial court failed to correctly analyze or apply the law.  *See id.* at 201–02; *Avalos*, 610 S.W.3d at 879.

MANDAMUS RELIEF

In its petition for writ of mandamus, TMLT argues the trial court's order granting Dr. Friedman's motion to compel Barnett's deposition was an abuse of discretion because, inter alia, it exceeded the scope of discovery.

"A trial court generally has discretion to determine the scope of discovery."  *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 802 (Tex. 2017) (orig. proceeding); *accord In re K & L Auto Crushers, LLC*, 627 S.W.3d 239, 247 (Tex. 2021) (orig. proceeding).  But "with regard to questions of law and mixed questions of law and fact, 'a trial court has no "discretion" in determining what the law is or applying the law to the facts.'"  *In re State Farm Lloyds*, 520 S.W.3d 595, 604 (Tex. 2017) (orig. proceeding) (quoting *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding)).

Here, the trial court's failure to correctly determine what the applicable law was and apply it to the facts was an abuse of discretion. *See In re K & L Auto Crushers*, 627 S.W.3d at 247; *In re State Farm Lloyds*, 520 S.W.3d at 604. And because its discovery order exceeded the permissible scope of discovery, TMLT lacks an adequate remedy at law. *See In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 795 (Tex. 2021) (orig. proceeding) ("[B]ecause the trial court's discovery order authorizes a deposition that exceeds the permissible scope . . . , it erroneously compels discovery of irrelevant information for which [relator] lacks an adequate appellate remedy."); *In re Nat'l Lloyds Ins. Co.*, 532 S.W.3d 794, 802 (Tex. 2017) (orig. proceeding) ("[A] discovery order that compels production beyond the rules of procedure is an abuse of discretion for which mandamus is the proper remedy." (quoting *In re Nat'l Lloyds Ins. Co.*, 507 S.W.3d 219, 223 (Tex. 2016) (orig. proceeding))).

## DISPOSITION

The trial court abused its discretion by granting Dr. Friedman's motion to compel Barnett's deposition, and TMLT has no adequate remedy by appeal. Accordingly, we conditionally grant TMLT's petition for writ of mandamus.

We order the trial court to do the following within thirty days of the date of this order: (1) vacate its August 10, 2023 Order Regarding the Deposition of Barbara C. Barnett, and (2) render an order quashing the deposition of Barbara C. Barnett. After the trial court vacates its August 10, 2023 order, our August 24, 2023 stay will be moot.

We tax costs of court against David J. Freeman, M.D. Our writ will issue only if we are informed that the trial court has failed to comply with this order.

Patricia O. Alvarez, Justice